## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KAREN SUE KIRLEY,                          )
                                           )
            Plaintiff,                     )
                                           )
      v.                                   )    C.A. No. 02-355 E
                                           )
OFFICER MATTHEW WILLIAMS, ET AL.,          )
                                           )
            Defendants.                    )

## OPINION

Presently before the Court is Defendants' "Motion for Summary Judgment Under F.R.C.P. 56" (doc. 35). For the reasons stated herein, we will deny the motion.

## I. Background

This case centers around an incident at plaintiff Karen Sue Kirley's home at 322 E. Ninth Street, Erie, Pennsylvania, on February 18, 2002. Ms. Kirley and her son, Mark, age 18, had a disagreement earlier that week. Mark Kirley had left the home and had gone to stay at the home of his girlfriend, Erin Christmas. Ms. Kirley changed the locks to the house after her son left.

On February 18, 2002, Mrs. Kirley observed that her son was a passenger in a van parked in front of her house and that the van was driven by Donald Christmas, the father of Mark's girlfriend and the owner of the residence where Mark had been staying. Mrs. Kirley approached the van and asked what has happening. Mark Kirley refused to speak to his mother; the two had not spoken to each other since he left the home three days earlier. Mrs. Kirley was told by Mr. Christmas that Mark wanted to come into the home and retrieve some belongings. Mark had attempted to enter the house moments earlier, when no one was home, but his house key would not work because the locks had been changed. Mrs. Kirley refused to let her son in the house, and Mr. Christmas called the Erie police department to ask if the police could assist Mark in gaining access to the home. Mr. Christmas explained to the police that Mark Kirley did not want any problems with his mother.

1

Although initially, the police refused to help, eventually, Officers Williams and Victory arrived at the home. They did not have a warrant to enter the home.

Certain facts concerning the initial entry into the home are in dispute, as will be explained below.

Upon their arrival, Officer Williams and Victory spoke with Mark and Mr. Christmas outside the house, and learned that Mark Kirley was 18 years old, had a key to the home, was a senior in high school at Cathedral Preparatory School, and that he wanted to remove his school clothes and school books from the house. They learned that Mark had been staying with the Christmas family for a few days. Officer Williams did not make inquiries as to who owned the property and did not attempt to verify that Mark's key actually fit the door's lock. He assumed the property was owned by Mrs. Kirley and that Mark was too young to have an ownership interest in the house. The officers knew that Mrs. Kirley had barred Mark from entering the property to retrieve his personal items. They had been lead to believe this was a potentially contentious situation, although nothing indicated that there was a risk of violence, harm, or criminal conduct of any kind.

The Kirley house is a two story house, with an enclosed porch and a front screen door. Once inside the porch, a visitor must then gain entry to the house through an interior wooden door with a lock. When Officer Williams first approached the house, Mrs. Kirley agreed to allow him to come into the enclosed porch area to discuss the situation. During their discussion, Mrs. Kirley explained that her son no longer lived there and she did not want her son to enter the house. Officer Williams informed her that he, Mark Kirley, and Officer Victory were coming into the house to retrieve Mark Kirley's belongings. According to Officer Williams, Mrs. Kirley had no choice but to permit him to enter the house, and he agrees that he was not invited any further than the front porch. Mrs. Kirley continued to state that Mark was not allowed in, and she did not consent to either the defendant officers or Mark's entry into the home. Nevertheless the men walked past her into the home. Mrs. Kirley contends that Officer Williams forced his way into the Kirley residence and that he shoved her from the vestibule area into the livingroom area.

The parties agree that after they entered the home, Officer Williams accompanied Mark to

2

the second floor of the house where both entered a bedroom, and Mark gathered some personal belongings. Officer Victory presumably remained on the main floor of the home. According to Mark, he could not find his clothing – including his much-needed school uniforms – in the usual locations. He therefore attempted to gain access to the third floor attic. Mrs. Kirley contends that Officer Williams told Mark to look around the house for whatever else he wanted to take with him. According to Mark, Mrs. Kirley stood in front of the doorway to the third floor attic and informed her son that he was not permitted to go into the attic. Mrs. Kirley contends that Mark was attempting to gain access to a closet in which her personal belongings were located. She claims that as she was standing in front of the stairwell, she informed Mark that he could not look in that closet. She further contends that Officer Williams ordered her to move away from the door, and when she refused, Officer Williams physically moved her away from the door. Mrs. Kirley followed her son to the third floor attic with Officer Williams following behind her. She claims she repeatedly asked her son to explain his conduct and asked what was going on.

According to Officer Williams, Mrs. Kirley stood in her son's way as he attempted to leave the attic. Officer Williams grabbed her by the wrist in order to compel her to move. Officer Williams claims that when he did so, Mrs. Kirley slapped his hand off her wrist and turned, raising her hand as if to strike Officer Williams a second time. In Mrs. Kirley's version of events, as she was standing at the top of the stairs, and without any warning or provocation, she was grabbed from behind by Officer Williams. She claims that he first grabbed her right arm, and then left arm and then handcuffed her. She denies ever attempting to strike Officer Williams. Officer Williams then preceded her down the stairs, and according to Mrs. Kirley, pulled her down the stairs by grabbing her right bicep. At some point Officer Victory came up one flight of stairs to assist Officer Williams, and Mrs. Kirley was placed under arrest and escorted out of the house to a waiting police vehicle for transportation to the City of Erie Police Station. As they were escorting her out of her house, she dropped a loaded firearm that she had concealed in her pocket.

Plaintiff alleges she injured her wrist as a result of the officers' unconstitutional conduct during her arrest. According to Mrs. Kirley, as she was being pulled down the stairs inside the home, she cried out in pain from the pressure of the handcuffs on her wrists. She claims that

3

Officer Williams tightened the handcuffs on her wrist even more. She denies the officers' assertion that she struggled with the officers and that she intentionally threw herself to the ground during this struggle.    Mrs. Kirley sought medical treatment for a number of months for her wrist injury. The charges against her for harassment were later dropped.

Mrs. Kirley has alleged that the defendant officers' conduct violated her rights under the fourth amendment to the United States Constitution to be free from unreasonable searches and seizures, by filing false and malicious charges, and by using unnecessary and unreasonable force, pursuant to 42 U.S.C. § 1983. She has also named the City of Erie and the Chief of Police of the City of Erie as defendants, alleging that the officers' conduct was carried out in accordance with the custom, policies and practices of the city and as followed and enforced by the Chief of Police.

Defendants have filed a motion for summary judgment on the grounds of qualified immunity.

We note that on June 28, 2006, we orally denied plaintiff's motion for partial summary judgment on the issue of whether her Fourth Amendment rights were violated by the defendant officers' warrantless entry into her home. In that motion the plaintiff had argued that there was no genuine issue of material fact as to the fact that Mrs. Kirley, the owner of the property, had not consented to the entry of the home. The defendants, in their brief in opposition to plaintiff's motion for partial summary judgment, argued that there was no genuine issue of material fact that Officers' Williams and Victory acted pursuant to consent given by both Mark Kirley and Mrs. Kirley. We denied the plaintiff's motion for partial summary judgment orally and without a written opinion after finding clear evidence of genuine issues of material fact as to the facts and circumstances surrounding the initial entry into the home. Nevertheless, after conducting a settlement conference with all counsel, we granted defendants' request to file a motion for summary judgment on the issue of qualified immunity, which had not been raised by defendants' prior counsel by way of motion. We granted this request in the interest of justice, even though such motion would be clearly beyond the deadlines established by our previous scheduling orders.

## II. Discussion

Defendant officers argue that they are entitled to qualified immunity insofar as they had an

4

objectively reasonable belief that they had consent to enter the plaintiff's property under the "apparent authority" doctrine. They argue that their actions were objectively reasonable and did not violate any clearly established rights of which they would have been aware. They also argue that they had probable cause to arrest Mrs. Kirley for harassment after she allegedly attempted to strike Officer Williams.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317 (1986). In reviewing the evidence, facts and inferences must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment must be entered in favor of the moving party "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party....." Id. at 586-87 (citations omitted). When a moving party has carried his or her burden under Rule 56, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts. . ." Id. (citations omitted). The nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment," and cannot "simply reassert factually unsupported allegations contained in [the] pleadings." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir.1989) (citation omitted). However, "[i]f the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, 477 U.S. 242, 249-50 (1986) (citations omitted).

"Qualified immunity is an objective question to be decided by the court as a matter of law." Carswell v. Borough of Homestead, 381 F.3d 235, 242 (3d Cir. 2004), citing Doe v. Groody, 361 F.3d 232, 238 (3d Cir. 2004). "The jury, however, determines disputed historical facts material to the qualified immunity question." Id.; see also Curley v. Klem, 298 F.3d 271, 278 (3d Cir. 2002). "A judge may use special jury interrogatories, for instance, to permit the jury to resolve the disputed facts upon which the court can then determine, as a matter of law, the ultimate question of qualified immunity." Curley, 298 F.3d at 279. At this stage, however, the summary judgment standard

requires the Court to resolve all factual disputes in Mrs. Kirley's favor and grant her all reasonable inferences, obviating any need to look to a jury. Because the qualified immunity doctrine provides the official with immunity from suit, not simply trial, Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 143-44 (1993), the district court should resolve any immunity question at the earliest possible stage of the litigation. Anderson v. Creighton, 483 U.S. 635, 646 at n. 6 (1987).

## A. Qualified immunity

"Qualified immunity shields public officials performing discretionary functions from § 1983 and Fourteenth Amendment liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " Abbott v. Latshaw, 164 F.3d 141, 148 (3d Cir. 1998), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Our qualified immunity inquiry is a two step process. First, we must determine whether the defendants violated "clearly established" rights. Id. This entails a finding of a constitutional or statutory violation as well as a finding that the violated right was clearly established at the time of the violation. Second, we determine whether a reasonable officer would have believed that his or her conduct deprived the plaintiff of his or her constitutional rights. Id.

The Fourth Amendment right allegedly violated here was clearly established at the time that the events that gave rise to this case took place. In Payton v. New York, 445 U.S. 573, 585 (1980), the Supreme Court made clear that warrantless searches are not permissible absent an exception. "[T]he chief evil against which the . . . Fourth Amendment is directed is warrantless entry and search of home." Id. While this general proposition may be enough for the first step of the qualified immunity analysis, the "right" in question must be framed with sufficient particularity to determine whether it was "clearly established" under the second step. Saucier v. Katz, 533 U.S. 194, 201-02 (2001). Rather, to find that a right was "clearly established," "the right allegedly violated must be defined at the appropriate level of specificity." Wilson v. Layne, 526 U.S. 603, 615 (1999). In a fact-bound Fourth Amendment situation, "the right the official is alleged to have violated must have been 'clearly established' *in a more particularized,* and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would

6

understand that what he is doing violates that right." Anderson, 483 U.S. at 640 (emphasis added). In other words, we must inquire "whether a reasonable officer *could have believed* [that his or her conduct] was lawful, in light of clearly established law and the information the [officer] possessed." Id. at 641 (emphasis added).

## B. Consent to Enter Home

The defendants argue that Officers Williams and Victory had reason to believe that Mark Kirley had apparent authority to consent to the entry of the police officers. When the material facts are not in dispute, the district court may decide whether a government official is shielded by qualified immunity as a matter of law. Id.

First, we note that there is no need to "particularize" the Fourth Amendment right implicated here beyond "the basic rule, well established by Supreme Court cases, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional." Groh v. Ramirez, 540 U.S. 551, 564 (2004), citing Payton, 445 U.S. at 586-88 (discussing qualified immunity and noting that "[n]o reasonable officer could claim to be unaware" of this rule). As in Groh, there was no exigency here,[1] and the Groh Court rejected, over a dissent, the notion that "ample room" must be made for mistaken judgments of law or fact in cases in which no exigency exists. Id. at 565 n. 9. Thus, the simple question we are faced with is whether it was reasonable for the officers to infer consent from the knowledge in their possession.

Although a warrantless search of a home is per se unreasonable under the Fourth and Fourteenth Amendments, there are exceptions to this rule. Third parties may give consent where a police officer is reasonably mistaken as to the actual authority of the party consenting to his entry; stated another way, the police officer reasonably mistakes apparent authority for actual authority to consent to his entry. Commonwealth v. Blair, 575 A.2d 593 (Pa. Super. 1990). In Blair, the court held that Blair's neighbor who answered the door at Blair's home had apparent authority to permit the police to enter the residence. Although the neighbor did not have actual authority to consent to

---

[1] Compare Mincey v. Arizona, 437 U.S. 385, 393-94 (1978), acknowledging the right of police to respond to emergency situations "threatening life or limb" and indicating that police may conduct a warrantless search provided that the search is "strictly circumscribed by the exigencies which justify its initiation."

the police officers entering Blair's residence, the police officer believed he did. The <u>Blair</u> court

reasoned that apparent authority sufficed:

> The Fourth Amendment of the Constitution of the United States embodies the concern of our society for the right of each individual to be let alone. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 236 (1973). The Fourth Amendment ensures that certain areas, particularly a home, are not subject to invasion at the caprice of investigating agencies. A citizen must be secure in knowing that his property and possessions are safe from search and seizure except in those situations where police have sufficient knowledge, probable cause, to believe that acts or things prohibited by our laws have or are occurring or where evidence of acts or things prohibited by our laws are located.
>
> A search conducted without a warrant issued upon probable cause is *per se* unreasonable under the Fourth and Fourteenth Amendments, subject only to a few specifically established and well-delineated exceptions. <u>Id.</u> at 222. One exception is a search that is conducted pursuant to consent. <u>Id.</u> Both federal and state constitutions allow for a third-party consent search exception to the warrant requirement. <u>Commonwealth v. Kean</u>, 382 Pa.Super. 587, 602, 556 A.2d 374, 387 (1989).

<u>Id.</u> at 596-97. Prior to <u>Blair</u>, third-party consent cases in the Commonwealth concerned situations

where: (1) the consenting party had "superior authority" to the party objecting to the search, see,

<u>Commonwealth v. Latshaw</u>, 392 A.2d 1301 (Pa. 1978), <u>cert. denied</u>, 441 U.S. 931 (1979) (barn's

owner had not surrendered any indicia of her absolute control over barn where defendant's

marijuana was found pursuant to warrantless search with consent of barn's owner); (2) the

consenting party had equal or common authority to the party objecting to the search, see,

<u>Commonwealth v. Arnold</u>, 480 A.2d 1066 (Pa. Super. 1984), <u>Commonwealth v. Lowery</u>, 451 A.2d

245 (Pa. Super. 1982), <u>Commonwealth v. Devlin</u>, 448 A.2d 594 (Pa. Super. 1982); (3) the

consenting party had inferior authority to the party objecting to the search, <u>see,</u> <u>Commonwealth v.</u>

<u>Garcia</u>, 387 A.2d 46 (Pa. 1978), <u>Commonwealth v. Netting</u>, 461 A.2d 1259 (Pa. Super. 1983) (third

party who has neither interest nor control in a premises may not give the police valid consent to

conduct a warrantless search of the premises); and (4) a police officer is reasonably mistaken as to

the actual authority of the party consenting to his entry; stated another way, the police officer

reasonably mistakes apparent authority for actual authority to consent to his entry. <u>Blair</u>, 575 A.2d

at 597.

However, in <u>Blair</u> the Commonwealth adopted the standard enunciated in <u>Nix</u>:

> We now align ourselves with those authorities, representing the majority view, which hold that apparent authority alone is required. We adopt this view because it is more consistent with the fourth amendment proscription of unreasonable searches and seizures than a rule requiring actual authority regardless of reasonable appearances.

8

Blair, 575 A.2d at 597, quoting Nix v. State, 621 P.2d 1347, 1349 (Alaska 1981). The Blair court held that the police officer's reasonable mistake must be judged from an objective standard based on the totality of the circumstances. 575 A.2d at 598. Although the police officer's state of mind is one factor to be considered, it is not the only factor. The police officer's mistake must be reasonable. In ambiguous situations, those situations which would cause a reasonable person to question the consenting party's actual authority or if the consenting party's assertions of authority appear unreasonable, a police officer should make further inquiries to determine the status of the consenting party. Id. Reliance on a third party's bald assertion in such situations could subject any search to the remedy of the exclusionary rule. Id.

Following on the heels of Blair, the United State Supreme Court, in Illinois v. Rodriguez, 497 U.S. 177, 186 (1990) concluded that the United States Constitution was not violated when officers entered a residence without a warrant because they reasonably (though erroneously) believed that the person who consented to their entry was a resident of the premises. The court stated that "determination of consent to enter must 'be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a [person] of reasonable caution in the belief' that the consenting party had authority over the premises." Id., quoting Terry v. Ohio, 392 U.S. 1 (1968).

In their brief in support of their motion for summary judgment, the defendant officers rely on three post-Blair cases as follows:

> The holding of Blair has been followed by other Pennsylvania Courts in various decisions. See: Commonwealth v. Hughes, 575 Pa. 447, 836 A.2d 893 (2003) (unidentified teenage girls present on the porch of the defendant's residence who responded to police that the defendant was not home but who told police "no problem" and opened the door in response to the police's question whether they could enter residence and look for defendant, found to have apparent authority to permit entry); Commonwealth v. Quiles, 422 Pa. Super. 153, 619 A.2d 291 (1993) (reasonable for police to assume that person answering the door "come on in" had apparent authority to consent to entry). In fact, a Pennsylvania Superior Court followed this reasoning prior to the Blair decision in the case of Commonwealth v. Van Jordan, 310 Pa. Super 516, 456 A.2d 1055 (1983). In the Van Jordan matter, the Superior Court held that a guest who answered the door of defendant's hotel room had apparent authority to consent to the entry of police.

Defs.' Br. In Supp. of M. For Summ. J. Under F.R.C.P. 56 (Doc. 36) at 6.

We have reviewed these cases and are of the opinion that they are factually distinguishable from the case at bar. In Hughes, two officers sought to interview a parolee whom they had seen earlier while patrolling in the area, and went to his home to question him about recent parole violations. There were several teenage girls standing on the front porch, and when the officers asked if Hughes was home, the girls stated he was not there. One officer then asked if the officers could go inside the house and the girls consented; two of the girls opened the door and followed them into the house. The officers searched the house and after seeing drugs and drug paraphernalia, waited to obtain consent from the owner of the home before they conducted a full search of the house. In holding that the actions of the girls provided the officers with the reasonable belief that the girls possessed common authority over the premises which in turn permitted them to provide valid consent to enter the residence, the court emphasized that when the officer asked if he could enter the home to look for Hughes, the girls responded unhesitantly, "no problem," and opened the door for them. Hughes, 836 A.2d at 901. The officers' belief was reasonable under these circumstances because the girls proactively helped the officers enter and did not hesitate to give their consent.

In Quiles, police officers validly conducted an initial search of a residence, but later returned to the scene a second time without a warrant. Upon arriving at the premises a second time, the officers knocked on the door and were advised by an unknown female to enter. After they entered, the officers chased the defendant upstairs and observed him discarding a pouch which later proved to contain cocaine. The court held that it was reasonable for the officers to assume that an individual answering a knock on the door with a command to "come on in" has the apparent authority to consent to entry into the premises. Quiles, 619 A.2d at 297.

In the third case relied upon by the defendants herein, Van Jordan, police officers learned from the defendant that a missing woman named Kathy Rossow was in the defendant's hotel room with a man named Sam. The officers went to the hotel room they knew to be registered in the defendant's name, accompanied by the night clerk. They

10

knocked, heard a male voice say "I'll be there in a minute" and heard water running in the
bathroom. About thirty seconds later the door was opened by a man later identified as Samuel
T. Feldi. The officers announced that their purpose was to locate the missing woman, and Mr.
Feldi told them that she was in bed, and admitted them to the room. Upon entering the room,
an officers observed an automatic weapon and drug paraphernalia in plain view. Miss
Rossow was in bed, and another man, Douglas Sharp, was seated on the sofa. The officer
instructed Rossow and Feldi to get dressed, and Rossow asked to use the bathroom. Before
permitting her to enter the bathroom, an officer searched the bathroom and found another
automatic pistol, $540 in cash, and bags of a substance which later analysis proved to be
methamphetamine. The three occupants were then placed under arrest and ordered to sit on
the sofa. The police then proceeded to search the entire room, including Van Jordan's closed
suitcase, which was found to contain leather used to make the holster in which one of the
weapons was found, a portable scale, and a photo of Van Jordan holding a bag containing
powder. Van Jordan returned to the motel room and he, too, was placed under arrest. The
court explained the nature of common authority:

> The authority which justifies the third-party consent does not rest upon
> the law of property, with its attendant historical and legal refinements,
> but rests rather on mutual use of the property by persons generally
> having joint access or control for most purposes, so that it is reasonable
> to recognize that any of the coinhabitants has the right to permit the
> inspection in his own right and that the others have assumed the risk that
> one of their number might permit the common area to be searched.

Van Jordan, 456 A.2d at 1058. The court explained that Feldi's use of the room and bath to
shower and change his clothes, and Van Jordan's acknowledgment that Kathy Rossow was in
his room "with Sam" confirm Feldi as a legitimate co-tenant of the motel room,
constitutionally able to allow the police to enter and search the premises without a warrant.

The critical issue before us is whether the defendant officers' beliefs that they were
acting lawfully were reasonable. When we view the evidence, facts and inferences in the
light most favorable to Mrs. Kirley, there are genuine issues of material fact as to whether the
key players in the search acted in a manner as alleged such that the legal conclusion could be
drawn that the officers had consent to enter the Kirley home pursuant to the apparent

11

authority doctrine. Assuming that Mrs. Kirley's version of events is credible to the fact-finder, it is unreasonable to conclude that Mark Kirley had apparent authority to consent to a search: the officers admit that they knew he hadn't lived in the house recently, they knew that he was not a tenant, they did not confirm that his door key worked, they assumed he did not have any ownership interest in the property, and it appears to be undisputed that Mrs. Kirley clearly voiced her refusal to permit entry. Contrary to the cases relied on by the defendants, there is no evidence that Mrs. Kirley ever said "come on in," or freely opened the door to allow the police to enter the home, or that Mark Kirley had mutual use of the house so that one could say that Mrs. Kirley assumed the risk that Mark might permit a search of their shared property. A reasonable officer would have at least refused to enter the property until he was satisfied that consent was given. See Payton, 445 U.S. at 585. The information arguably in Officer Williams' possession could not reasonably have supported the belief that his actions were constitutional. Furthermore, Officer Williams admitted at the court hearing on the charges filed against Mrs. Kirley that he was not invited any further than the front porch. See Harvey v. Plains Township, 421 F.3d 185 (3d Cir. 2005). We therefore deny defendant's motion for summary judgment on the basis of qualified immunity as to the issue of the constitutionality of their entry into the home.

## C. Probable Cause to Arrest

The defendants also claim that they are entitled to qualified immunity on the issue of whether Mrs. Kirley's arrest was lawful. They argue that they had probable cause to justify her arrest.

Probable cause to arrest exists if the facts and circumstances within the knowledge of the police officer at the time of the arrest are sufficient to justify a person of reasonable caution in believing the suspect has committed or is committing a crime. Orsatti v. New Jersey State Police, 71 F.3d 480, 483 (3d Cir. 1995); Commonwealth v. Rodriguez, 585 A.2d 988 (Pa. 1981). In determining whether probable cause existed in the particular situation, a court will look not just at one or two individual factors, but will consider the "totality of the circumstances" as they appeared to the arresting officer. Commonwealth v. Quiles, 619 A.2d

12

(Pa. Super. 1993). In the event we find that the arrest of Mrs. Kirley was based on probable cause, there is no constitutional claim for false imprisonment or malicious prosecution. Baker v. McCollan, 443 U.S. 137, 143-44 (1979).

Under Pennsylvania law, harassment arises "when, with the intent to harass, annoy, or alarm another person, he strikes, shoves, kicks or otherwise subjects him to physical contact, or attempts or threatens to do the same." 18 Pa.C.S.A. §2709(a) (Purdons 2003). The defendants argue that based upon this definition, Officer Williams had probable cause, or at least reasonably believed he had probable cause, to arrest Mrs. Kirley for striking him and preparing to strike him a second time. Yet according to Mrs. Kirley, as she was standing at the top of the stairs, and without any warning or provocation, she was grabbed from behind by Officer Williams. When viewing the facts in the light most favorable to the non-movant, we find that a genuine issue of material fact exists as to whether the officers had probable cause to arrest Mrs. Kirley. We will therefore deny the defendants' motion for summary judgment on the grounds of qualified immunity as to the issue of probable cause to arrest Mrs. Kirley.

As to the remaining arguments proferred by the defendant City of Erie and Chief of Police Charles Bower, we will deny the motion for summary judgment on the grounds of untimeliness. We made it clear in our order dated June 28, 2006 that we were permitting the defendant police officers to file motions for summary judgment on the basis of qualified immunity. We did not grant leave to the other defendants to a motion for summary judgment on other grounds.

An appropriate order will be issued.

Maurice B. Cohill Jr.

Maurice B. Cohill, Jr.
United States District Court Senior Judge

Dated:   2/15/2007

13